# UNITED STATES DISTRICT COURT
## for the SOUTHERN DISTRICT OF INDIANA,
### INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| **BILLY R. BELTON,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| *vs.* | ) | **CAUSE NO. 1:11-cv-248-DKL-JMS** |
| | ) | |
| **MICHAEL J. ASTRUE, Commissioner of** | ) | |
| **Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## ENTRY

On December 21, 2006, Billy R. Belton applied for disability insurance benefits ("DIB") and supplemental security income benefits ("SSI") under the Social Security Act,[1] alleging that he is unable to work due to a disability that began on December 18, 2006. The Commissioner of Social Security ultimately found that Mr. Belton was disabled, but he found that the disability did not begin until August 29, 2008. Because Mr. Belton's eligibility for DIB expired on December 31, 2006, the Commissioner's decision entitled him to only SSI. Mr. Belton sued for judicial review of the Commissioner's decision.

Judicial review of the Commissioner's factual findings is deferential: courts must affirm if his findings are supported by substantial evidence in the record. 42 U.S.C. § 405(g); *Skarbek v. Barnhart*, 390 F.3d 500, 503 (7th Cir. 2004); *Gudgel v. Barnhart*, 345 F.3d 467,

---

[1] DIB is available for persons who have achieved insured status through employment and withheld premiums. 42 U.S.C. § 423, *et seq.* SSI is available for uninsured individuals who meet income and resources criteria. 42 U.S.C. § 1381, *et seq.*

470 (7th Cir. 2003).   Substantial evidence is more than a scintilla, but less than a

preponderance, of the evidence.  *Wood v. Thompson*, 246 F.3d 1026, 1029 (7th Cir. 2001).  If

the evidence is sufficient for a reasonable person to conclude that it adequately supports

the Commissioner's decision, then it is substantial evidence.  *Richardson v. Perales*, 402 U.S.

389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971); *Carradine v. Barnhart*, 360 F.3d 751, 758 (7th

Cir. 2004).  This limited scope of judicial review derives from the principle that Congress

has designated the Commissioner, not the courts, to make disability determinations:

> In reviewing the decision of the ALJ [administrative law judge], we cannot
> engage in our own analysis of whether [the claimant] is severely impaired as
> defined by the SSA regulations.  Nor may we reweigh evidence, resolve
> conflicts in the record, decide questions of credibility, or, in general,
> substitute our own judgment for that of the Commissioner.  Our task is
> limited to determining whether the ALJ's factual findings are supported by
> substantial evidence.

*Young v. Barnhart*, 362 F.3d 995, 1001 (7th Cir. 2004).  *Carradine*, 360 F.3d at 758.  While

review of the Commissioner's factual findings is deferential, review of his legal conclusions

is *de novo.  Jones v. Astrue*, 623 F.3d 1155, 1160 (7th Cir. 2010).


Under the Social Security Act, disability is defined as the "inability to engage in any

substantial gainful activity by reason of any medically-determinable physical or mental

impairment which can be expected to result in death or has lasted or can be expected to last

for a continuous period of not less than 12 months".  42 U.S.C. §§ 416(I) and 423(d)(1)(A).

A person will be determined to be disabled only if his impairments "are of such severity

that he is not only unable to do his previous work but cannot, considering his age,

education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A). The combined effect of all of an applicant's impairments shall be considered throughout the disability determination process. 42 USC § 423(d)(2)(B).

The Social Security Administration ("SSA") has implemented these statutory standards in part by prescribing a "five-step sequential evaluation process" for determining disability. 20 C.F.R. § 404.1520. If disability status can be determined at any step in the sequence, an application will not be reviewed further. *Id.* At the first step, if the applicant is currently engaged in substantial gainful activity, then he is not disabled. At the second step, if the applicant's impairments are not severe, then he is not disabled. A severe impairment is one that "significantly limits [a claimant's] physical or mental ability to do basic work activities." 20 C.F.R. § 404.1520(c). Third, if the applicant's impairments, either singly or in combination, meet or equal the criteria of any of the conditions included in the Listing of Impairments, 20 C.F.R. Part 404, Subpart P, Appendix 1, then the applicant is deemed disabled. The Listing of Impairments are medical conditions defined by criteria that the SSA has pre-determined are disabling. 20 C.F.R. § 404.1525. If the applicant's impairments do not satisfy a Listing, then his residual functional capacity ("RFC") will be determined for the purposes of the next two steps. RFC is an applicant's ability to do work on a regular and continuing basis despite his impairment-related physical and mental limitations. 20 C.F.R. § 404.1545. At the fourth step, if the applicant has the RFC to perform

his past relevant work, then he is not disabled.  Fifth, considering the applicant's age, work experience, and education (which are not considered at step four), and his RFC, he will not be determined to be disabled if he can perform any other work that exists in significant numbers in the national economy.

The burden rests on the applicant to establish steps one through four.  The burden then shifts to the Commissioner at step five to establish that there are jobs that the applicant can perform in the national economy.  *Young v. Barnhart*, 362 F.3d 995, 1000 (7th Cir. 2004).  If an applicant has only exertional limitations, the Medical-Vocational Guidelines, 20 C.F.R. Part 404, Subpart P, Appendix 2 (the "grids"),  may be used at step five to arrive at a disability determination.  The grids are tables that correlate an applicant's age, work experience, education, and RFC with predetermined findings of disabled or not-disabled.  20 C.F.R. §§ 404.1569 and 1569a.  If an applicant has non-exertional limitations or exertional limitations that restrict the full range of employment opportunities at his RFC level, then the grids may not be used and a vocational expert must testify regarding the numbers of jobs existing in the economy for a person with the applicant's particular vocational and medical characteristics.  *Id.*; *Lee v. Sullivan*, 988 F.2d 789, 793 (7th Cir. 1993).  The grids result, however, may still be used as an advisory guideline in such cases.  20 C.F.R. § 404.1569.

An application for benefits, together with any evidence submitted by the applicant and obtained by the agency, undergoes initial review by a state-agency disability examiner

and a physician or other medical specialist. If the application is denied, the applicant may request reconsideration review, which is conducted by different disability and medical experts. If denied again, the applicant may request a hearing before an administrative law judge ("ALJ").[2] An applicant who is dissatisfied with the decision of the ALJ may request the SSA's Appeals Council to review the decision. If the Appeals Council either declines to review or affirms the decision, then the applicant may file an action in district court for judicial review. 42 U.S.C. § 405(g). If the Appeals Council declines to review a decision, then the decision of the ALJ becomes the final decision of the Commissioner for judicial review.

## Procedural history

When Mr. Belton applied for benefits in December 2006, he was 48 years old. His application, submitted without the assistance of counsel, asserted that he was disabled due to lower back pain and bi-polar disorder. (R. 156). His back pain allegedly resulted from an injury suffered in 2005 on a construction job site when he picked up a load of steel. (R. 35). The injury subsequently developed into or was exacerbated by existing degenerative disc disease. He alleged an onset date of December 18 or 21, 2006, (R. 98, 156), which are the dates he began working for and then was terminated from a roofing company

---

[2] Initial and reconsideration reviews in Indiana are performed by an agency of state government (the Disability Determination Bureau, a division of the Indiana Family and Social Services Administration) under arrangement with the SSA. 20 C.F.R. Part 404, Subpart Q (§ 404.1601, *et seq.*). Hearings before ALJs and subsequent proceedings are conducted by personnel of the federal SSA.

respectively.  He was terminated for inability to perform the physical duties of the job due to his back pain.  (R. 156).[3]

Mr. Belton's application was denied on initial review on May 4, 2007.  (R. 46, 47, 52).  The state-agency physician and the disability examiner who conducted the initial review recorded a primary diagnosis of "Osteoarthritis & Allied Disorders" and a secondary diagnosis of "Schizophrenic, Paranoid & Other Funct. [functional] Psychotic DS [disorders]."  (R. 46 (DIB), 47 (SSI), blocks 16A and 16B).  In November 2007, Mr. Belton engaged his present counsel, (R. 61, 62), who sought and obtained a belated reconsideration review of the application, (R. 64).  That review resulted in a denial in March 2008.  (R. 66, 48, 49).  The different state-agency experts reviewed the same primary and secondary diagnoses as the initial reviewers.  (R. 48, 49).  Mr. Belton requested a hearing before an ALJ on March 27, 2008.  (R. 72).  He was incarcerated in late April 2008, for an unknown duration.  (R. 464).  On July 21 and 22, 2009, after additional evidence was added to the record, Mr. Belton's application received a second reconsideration by state-agency experts on an internal "informal remand," which did not result in a disability finding.  (R. 50, 51,

---

[3] Mr. Belton's job history consisted of general labor in construction:  **(1)** from 1978 to 1998, with some gaps between jobs; **(2)** June 2002 to September 2003; **(3)** "off and on" from June 2005 to July 2006; **(4)** one week in September 2006; and **(5)** from December 18 to 21, 2006, when he was terminated for inability.  (R. 157, 201).  Mr. Belton has been incarcerated at different times during these periods for a total of 22 years, on convictions for, *inter alia*, battery, rape, and robbery.  (R. 38).

454, 455).[4]

Until Mr. Belton retained an attorney six months after the May 2007 initial denial of his application, he had asserted that his disability was due to lower back pain and bi-polar disorder. Mr. Belton then obtained counsel and belatedly moved for reconsideration of his application. In its December 2007 explanation for granting the request, the state agency noted Mr. Belton's assertion, apparently for the first time, of other severe mental disorders, including schizophrenia, and illiteracy. (R. 65). The state agency relied on the April 2007 opinion of clinical psychologist Dr. Leiphart that resulted from her consultative mental-status examination of Mr. Belton that the agency had ordered as part of its evaluation of his application. (R. 291). (Dr. Leiphart's report had been issued about one month before the initial review of Mr. Belton's application occurred.) The state agency specifically noted that Dr. Leiphart's report

> shows that Mr. Belton does, in fact, have severe mental deficiencies, including extremely low VIQ [verbal intelligence quotient] and PIQ [performance IQ] scores and and [*sic*] an FSIQ [full-scale IQ] in the mild mental retardation range of intellectual functioning. Dr. Leiphart made several observations from her testing, including "results appeared to be valid for some type of cognitive disorder" referring to schizophrenia in his family and possible bi-polar DS [disorder]. She also, found him incapable of

---

[4] Although additional Disability Determination and Transmittal ("DDT") forms were generated as are done for initial and reconsideration reviews, (R. 50, 51), no diagnoses or determination are noted thereon, (*id.*, blocks 16A, 16B, and 19). However the supporting Case Analysis forms (SSA-416-U4), generated by the reviewing physicians, and referred to in the DDTs, record their conclusions that "[r]eview of evidence does not support a fully favorable decision," (R. 454, J. Sands, M.D.), and "[t]he medical evidence has been reviewed and a favorable decision cannot be made on the basis of this ME," (R. 455, Kenneth Neville, Ph.D.).

managing his own funds.

(R. 65). This apparently was the first mention in the Record of mental retardation and schizophrenia as possible impairments suffered by Mr. Belton.[5] Shortly thereafter, in January 2008, an update on Mr. Belton's condition was obtained *via* the completion of another "Disability Report – Appeal." (R. 171). In this report, Mr. Belton listed that he had received psychiatric treatments for paranoid schizophrenia, depression, and anxiety. (R. 173). In the narrative portion of the report, Mr. Belton described that he was totally disabled due to a combination of mental and physical problems. Mentally, he asserted paranoid schizophrenia (with auditory and visual hallucinations), bipolar disorder, anxiety, and depression (with suicide attempts, mood swings, and avoidance of people). (R. 176). Physically, he asserted back pain; left arm, shoulder, and knee pain; pain and tingling down both legs; and dizziness. He also described the functional limitations that these impairments cause. (*Id.*). Thus, Mr. Belton's possible mental retardation or other cognitive disorder was indicated or suggested in the record before the initial and reconsideration reviews of his application.

A hearing before an ALJ was held on December 7, 2009. (R. 30). Mr. Belton's pre-hearing memorandum alleged that he was disabled due to **(1)** schizophrenia, with

---

[5] In a Disability Report form completed in February 2007, (R. 155), shortly after applying for benefits, Mr. Belton noted that he had attended special-education classes in high school for students who were unable to read and that he had graduated high school without learning how to read or write, (R. 161). Thus, there was some indication of a cognitive issue early in the claim process.

paranoia, delusions, and hallucinations; **(2)** major depressive disorder with psychotic features; **(3)** mild mental retardation; and **(4)** chronic back pain. (R. 203). Mr. Belton and a vocational expert testified. At the conclusion of the hearing, the ALJ decided to send Mr. Belton to an orthopedist for a consultative physical examination and for the orthopedist to evaluate a January 2008 MRI. That examination occurred on January 11, 2010. (R. 518). The ALJ issued his decision on July 30, 2010. (R. 8-24).

The ALJ found that Mr. Belton met the insured-status requirements of the Social Security Act through December 31, 2006, (R. 14), which was just a few days past Mr. Belton's asserted disability-onset date of December 18, 2006. At step one of the five-step process, the ALJ found that Mr. Belton had not engaged in substantial gainful activity since his alleged onset date. At step two, the ALJ found that, since December 18, 2006, Mr. Belton has had the severe impairments of **(1)** degenerative disc disease, **(2)** schizoaffective disorder, **(3)** cognitive disorder, and **(4)** substance abuse. At step three, the ALJ evaluated Mr. Belton's impairments under Listings 1.04, disorders of the spine; 12.02, organic mental disorders; 12.03, schizophrenic, paranoid, and other psychotic disorders; 12.04, affective disorders ("[c]haracterized by a disturbance of mood, accompanied by a full or partial manic or depressive syndrome"); and 12.09, substance addiction disorders. (R. 15, 16). The ALJ did not evaluate Listing 12.05, mental retardation. Because he found no "marked" limitations in the three functional categories as required by the B criteria of the Listings; no repeated episodes of decompensation of extended duration, as required by the B and C

criteria of the Listings; and no evidence of an extended inability to function outside a highly supportive living arrangement, as required by the C criteria of the Listings, the ALJ concluded that Mr. Belton's severe and non-severe impairments, singly or in combination, did not meet or medically equal any of the Listing of Impairments.

For the purposes of steps four and five, the ALJ next determined Mr. Belton's RFC. After evaluating the objective medical evidence and Mr. Belton's alleged symptoms, the ALJ found "a dichotomy between the claimant's allegations and the evidence of record" that "reflects poorly on his credibility." (R. 22). Although the ALJ did not doubt that Mr. Belton suffered from "a variety of physical and mental symptoms," he found "very little treatment present to support [Mr. Belton's] allegations" of disabling symptoms and found that the longitudinal medical record failed to support the alleged frequency and severity of symptoms. (R. 19, 20). Accommodating the degree of symptoms and limitations that he found credible, the ALJ found that Mr. Belton retained the residual functional capacity to perform sedentary work with the following restrictions. Exertionally, Mr. Belton could only occasionally balance, stoop, kneel, crouch, crawl, and climb. Non-exertionally, Mr. Belton had four restrictions: **(1)** he was limited to simple, repetitive tasks requiring little or no independent judgment or analysis; **(2)** his work environment should be not more than mildly to moderately stressful; **(3)** his work goals should either be static or communicated daily by a supervisor; and **(4)** there should be minimal changes in his work environment. In addition, the ALJ found that Mr. Belton was restricted to working at two-

hour stretches before taking a ten- or fifteen-minute break to refresh his ability to work.

At step four, the ALJ found that this RFC and restrictions prevented Mr. Belton's performance of his past relevant work in construction. At step five, the ALJ noted that, prior to August 29, 2008, Mr. Belton was classified as a "younger individual age 45-49," that he had a limited education with the ability to communicate in English, and that transferability of job skills was irrelevant because he was unable to perform his past relevant work. (R. 22). Using the Grids as a guideline, the ALJ found that Rule 201.18 applied according to his vocational factors and that it would direct a finding of "not disabled." (R. 23).[6] Because the ALJ found that Mr. Belton's non-exertional impairments prevented him from performing the full range of work at the sedentary level, he called a vocational expert to testify at the hearing and asked his opinion regarding the number of jobs that Mr. Belton could perform under three hypothetical situations. The first was Mr. Belton performing at a RFC level of light work with the additional exertional and non-exertional restrictions described above. The second was Mr. Belton performing at a RFC level of sedentary work with the same restrictions. The third was all of Mr. Belton's testimony accepted as fully credible. The vocational expert testified to the existence of 14,192 jobs, 6,804 jobs, and 0 jobs, respectively. Based on his finding of an RFC for

---

[6] Rule 201.18 of the Grid applies to the following factors: age of "a younger individual age 45-49," previous work experience of "unskilled or none," and education of "limited or less — at least literate and able to communicate in English." The SSA defines illiteracy as "the inability to read or write." 20 C.F.R. § 404.1564(b)(1). Mr. Belton has alleged consistently that he cannot either read or write.

sedentary work, the restrictions described above, the Grid result, and the vocational expert's testimony, the ALJ found that Mr. Belton was not disabled before August 29, 2008.

On that date, however, Mr. Belton turned 50 years old and his age category changed from "younger individual age 45-49" to "closely approaching advanced age." The ALJ found that Grid Rule 201.09 then applied which would direct a finding of "disabled" under the vocational factors of closely approaching advanced age and limited or less education. (Again, the ALJ found work experience irrelevant). Using the Grid rule as a guideline, the ALJ concluded that Mr. Belton was disabled on and after August 29, 2008. Because his insured status expired on December 31, 2006, this finding meant that Mr. Belton was eligible for only SSI benefits.

On January 7, 2011, the Appeals Council denied Mr. Belton's request for review, (R. 1), which rendered the ALJ's decision the final decision of the Commissioner for judicial review. This suit followed.

### Arguments and discussion

Mr. Belton asserts five errors in the ALJ's decision requiring reversal. The Court addresses them in the order presented.

**1. Violation of S.S.R. 83-20.** Mr. Belton argues that the ALJ's onset-date determination violated Social Security Ruling 83-20. S.S.R. 83-20 requires ALJs to consider three factors when determining an onset date in disabilities of non-traumatic origin: **(1)**

applicant allegations, **(2)** applicant's work history, and **(3)** medical and other evidence of impairment severity. Mr. Belton argues that the ALJ violated this Rule by basing his onset decision solely on the date that he turned fifty years old. It appears that this argument asserts two errors. First, the ALJ failed to consider the three factors mandated by S.S.R. 83-20 because he ignored or mischaracterized the evidence that proved Mr. Belton's alleged onset date of December 18, 2006, in favor of applying the Grid at age 50. Second, the ALJ erroneously used the Grid results because his non-exertional impairments rendered the Grid inapplicable. Both of these asserted errors are quickly disposed of.

Mr. Belton merely states the conclusion that the ALJ ignored or mischaracterized evidence proving Mr. Belton's alleged onset date. He fails to develop his argument by citing specific ignored or mischaracterized evidence, demonstrating that it was ignored or mischaracterized, and explaining how the specific evidence establishes Mr. Belton's alleged onset date. If Mr. Belton intended to incorporate his later specification of evidentiary errors, he did not do so and those specifications will be addressed in their order and context. In addition, Mr. Belton is clearly wrong in his assertion that the ALJ's decision was dictated by the grids. The ALJ specifically noted that the grids did not control his disability decision precisely because Mr. Belton's non-exertional impairments impeded his performance of all or substantially all of the requirements at the sedentary level of work. (R. 23). That is the reason that the ALJ called the vocational expert to testify and he relied on the VE's testimony in finding that there were a sufficient number of jobs that Mr. Belton

retained the capacity to perform. When the grids cannot be used to direct a finding of disability, they nonetheless must be considered as a framework or guidance for a decision. 20 C.F.R. Part 404, Subpart P, App. 2 § 200.00(d) and (e); *Haynes v. Barnhart*, 416 F.3d 621, 628-29 (7th Cir. 2005). The ALJ explained that he used the grids rules as guidelines or a framework for his decision. His determination of Mr. Belton's onset date was not dictated by the grids and was not based solely on his age.

**2. Medical opinion on Listings equivalence.** Mr. Belton argues that the ALJ erred by failing to summon a psychologist to testify on whether his combined impairments medically equaled a listed impairment at Step 3 of the analysis. Thus, the ALJ substituted his own layman's opinion for the required expert opinion on the medical question of Listings equivalence. The Commissioner responds that an additional expert opinion on medical equivalence was not required because the record "contained the opinions of two state agency physicians and two state agency psychologists who reviewed all the evidence of record and determined that Plaintiff retained the functional capacity for simple, repetitive work at the light level of exertion." (*Defendant's Memorandum in Support of the Commissioner's Decision* [doc. 26] at 9). The Commissioner cites **(1)** the Physical Residual Functional Capacity form (R. 297), completed by Dr. Ruiz, M.D., and the Mental Residual Functional Capacity (R. 305) and Psychiatric Review Technique forms (R. 309), completed by Dr. Kenneth Neville, Ph.D., psychologist, for the initial review of Mr. Belton's application, and **(2)** the one-page SSA-416 forms completed by Dr. Montoya, M.D., (R. 348),

and Dr. Joseph Pressner, Ph.D., psychologist, (R. 347), containing the single sentence that they had reviewed all the evidence in the file and affirmed the above forms as written for initial review.

Qualified medical opinion is required on the question of medical equivalence. S.S.R. 96-6p; *Barnett v. Barnhart*, 381 F.3d 664, 670 (7th Cir. 2004). *See*, *Rohan v. Chater*, 98 F.3d 966, 970-71 (7th Cir. 1996) (an ALJ may not substitute her layman's opinion for that of medical professionals). The signatures of state-agency medical or psychological experts on Disability Determination and Transmittal, Psychiatric Review Technique, and other forms "ensures that consideration by a physician (or psychologist) designated by the Commissioner has been given to the question of medical equivalence at the initial and reconsideration levels of administrative review." S.S.R. 96-6p. 20 C.F.R. 404.1527(f)(2)(1); S.S.R. 86-8; *Shenk v. Barnhart*, 357 F.3d 697, 700 (7th Cir. 2004); *Scott v. Sullivan*, 989 F.2d 519, 524 (7th Cir. 1990).

Mr. Belton's argument is conclusory. The ALJ repeatedly noted his consideration of, and agreement with, the state-agency consultants' opinions, as expressed in the forms cited above. Mr. Belton points out no formal errors with the consultants' forms that are relevant to the issue of Listings equivalence (*e.g.*, significant equivalence evidence that was not part of the record at the times the forms were completed) or substantive problems with the opinions expressed (*e.g.*, consultants' failures to evaluate a particular Listing and ambiguous or contradictory opinions). Mr. Belton merely asserts that "[t]he ALJ cited no

evidence but also simply assumed (R. 13) that Billy Belton's impairments did not medically equal any Listing." (*Plaintiff's Brief in Support of Complaint* [*etc.*] [doc. 25] at 16). On the contrary, the ALJ cited much record evidence and specifically relied on the findings of the state-agency reviewers on the subject of medical equivalence. (R. 15, 16). Mr. Belton has not shown that the ALJ committed error by failing to summon a special medical expert on the subject of Listing equivalence.

**3. Ignored or rejected evidence.** In another attack on the ALJ's step-three determination, Mr. Belton argues that the ALJ ignored or arbitrarily rejected nine items of treatment or examination evidence that proves that his combined impairments medically equals Listings 12.03, 12.04, and/or 12.05. In general, Mr. Belton fails to explain how each item of evidence he lists proves or supports the existence of any particular criterion of a Listing. In addition, because an ALJ is not required to discuss, or articulate his evaluation of, every item of evidence, *Jelinek v. Astrue*, 662 F.3d 805, 811 (7th Cir. 2011); *McKinzey v. Astrue*, 641 F.3d 884, 891 (7th Cir. 2011), Mr. Belton was required to show how every piece of evidence that he contends was ignored required specific discussion by the ALJ in the context of his discussion of other evidence of record. Mr. Belton failed to do so.

**a. IPS school transcript (R. 456-57).** This high-school transcript records that Mr. Belton received a score of 69 on an "Otis Gamma" test in September 1973, when he entered high school. Mr. Belton presented evidence that the Otis Gamma test is an IQ or mental-

ability test.  (*Plaintiff's Reply* [doc. 27] at 4-5 n. 1).[7]  No discussion or recognition of this test

result appears in the ALJ's decision or any of the state-agency consultants' reports of their

reviews of the evidence.  Mr. Belton contends that the score is relevant to the issue of

whether he meets or medically equals Listing 12.05C for mental retardation.[8]

> Listing 12.05C's provides:
>
> Mental retardation refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period:  *i.e.*, the evidence demonstrates or supports onset of the impairment before age 22.
>
> > The required level of severity for this disorder is met when the requirements in A, B, C, or D are satisfied.
>
> > *              *              *
> > C.  A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function . . . .

Paragraph C's requirement of "an impairment imposing an additional and significant

work-related limitation of function" parallels the *de minimis* functional limitation that

defines an impairment as "severe" step two.  *Carpenter v. Astrue*, 537 F.3d 1264, 1266 (10th

Cir. 2008); *Chunn v. Barnhart*, 397 F.3d 667, 671 (8th Cir. 2005).  See *Sird v. Chater*, 105 F.3d

401, 403-05 (8th Cir. 1997) (second prong of 12.05C means that the additional impairment

has a "more than slight or minimal" effect on a claimant's ability to perform work;

---

[7] See also Raymond J. Corsini, *The Dictionary of Psychology* at 680 (2002).

[8] The ensuing discussion represents a generous extension of the Court's discretion considering the thinness of Mr. Belton's argument.

significant means more than minimal but less than severe). The additional impairment need not be disabling in itself or 12.05C is meaningless. *Id.*

The only IQ scores that the ALJ mentions in his decision are those by the consulting psychologist to whom Mr. Belton was sent by the state agency for examination. (R. 291-96). In April 2007, Dr. Leiphart performed a mental-status examination and administered the Wechsler Adult Intelligence Scale–III test ("WAIS–III"). She introduced the scores with the observations that "The claimant was attentive at times, tuned out at times, generally cooperative. He appeared to put forth a minimal effort." (R. 293). Mr. Belton's scores were a verbal IQ ("VIQ") of 62, performance IQ ("PIQ") of 55, and full-scale IQ ("FSIQ") of 65. Dr. Leiphart noted that the VIQ and PIQ scores were in the "extremely low range," and the FSIQ was in the "mild mental retardation range." (R. 293). She also noted that previous test results were not available for comparison. She concluded that the results "appeared to be valid for some type of cognitive disorder." (R. 293).

Dr. Leiphart ultimately diagnosed Mr. Belton on Axis I (for clinical disorders and other conditions that might be a focus of clinical attention)[9] with schizoaffective disorder, cognitive disorder not otherwise specified, and a history of polysubstance abuse. (R. 294). On Axis II (for personality disorders and mental retardation), Dr. Leiphart noted "No diagnosis." On Axis V, for Global Assessment of Functioning ("GAF"), she rated Mr.

---

[9] American Psychological Association, *Diagnostic and Statistical Manual of Mental Disorders, Text Revision* at 27 (4th ed., 2000) ("DSM-IV-TR").

Belton at a current GAF of 50 and a highest GAF for the past year of 50.[10]  A rating of 50 represents "**Serious symptoms** (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) **OR any serious impairment in social, occupational, or school functioning** (e.g., no friends, unable to keep a job)."  DSM-IV-TR at 34.  Dr. Leiphart did not indicate which component, severity of symptoms or severity of functional limitation, accounted for her rating of 50; if it was for the degree of Mr. Belton's functional limitation, then her opinion was that Mr. Belton was unable to keep a job at the time of her examination, and that he had been unable to keep a job during the previous year.  She also concluded that Mr. Belton was not capable of managing his funds.  (R. 294).

For the purposes of the criteria of Listing 12.05C, Dr. Leiphart's IQ scores were consistent with the Otis Gamma score recorded on Mr. Belton's school transcript[11] but she specifically noted that previous test results were not available for comparison.  The ALJ stated that "[i]t is apparent that Dr. Leiphart gave little, if any, credence to the IQ testing,"

---

[10] The GAF is a clinician's evaluation of a subject's overall level of functioning considering his psychological, social, and occupational functioning.  Each rating along the ten ranges of scores has two components:  the subject's symptom severity and a rating of his functional limitations.  The ultimate score assigned represents the lower rating of the two.  DSM-IV-TR at 32-34.

[11] The Court recognizes that there might be an issue with conversion of the Otis score for strict comparability with the WAIS-III.  However, because neither the ALJ nor any state-agency consultant acknowledged or discussed the Otis score, there is no record basis for the Court to find that the scores are not comparable as is.  It is a matter for the ALJ to address on remand.

(R. 16), but he did not explain the basis for this finding which makes review difficult.[12] He might have had in mind the fact that Dr. Leiphart gave a response of "no diagnosis" on Axis II where a diagnosis of mental retardation would have been recorded or the fact that she wrote that the WAIS-III scores were valid for "some type of cognitive disorder," without specifying the degree of mental retardation that the scores indicate.[13] None of the state-agency psychologists recorded an evaluation of the evidence under Listing 12.05C. Under the Functional Capacity Assessment section of the Mental Residual Functional Capacity form, Dr. Neville gave an shorthand, cryptic summary of Dr. Leiphart's report,[14]

---

[12] The Commissioner asserts that the ALJ "reasonably determined that the I.Q. scores obtained during [Dr. Leiphart's] examination were not entirely valid due to Plaintiff's poor effort on testing," (*Defendant's Response* at 8-9), and asserts that "Dr. Leiphart opined that Plaintiff put forth 'little effort' on testing," (*id.*, at 5). On the contrary, the ALJ nowhere states that that was his reason for discounting the IQ test results and, in fact, those are not opinions or explanations made by Dr. Leiphart. She did not state that Mr. Belton had made a "poor effort" or "little effort" but only that he made a "minimal effort." "Minimal" is ambiguous in a way that "poor" and "little" are not; "minimal" could reasonably mean that Mr. Belton made an effort that was minimally sufficient for the validity of the scores. Dr. Leiphart herself did not explicitly evaluate the validity of her test results. If she had been aware of Mr. Belton's Otis Gamma score from his developmental period, and considered it consistent with his current scores, perhaps her opinion would have been more definitively stated on this matter.

The Commissioner also mischaracterized Dr. Leiphart's report when he asserted that she "noted that Plaintiff's scores placed him in the mildly mentally retarded range . . . ." (*Defendant's Response* at 9). As noted above, she stated this evaluation in reference to only Mr. Belton's FSIQ. (R. 293). She wrote that both his VIQ and PIQ were in the "extremely low range." (*Id.*).

[13] An IQ score of 70 or below represents mental retardation. DSM-IV-TR at 740.

[14] "4/07 - MSE . . . hx of substance abuse . . denies current . . ?  credible . . . mild paranoid ideation . . loose associations . . schizoaffective d/o; cog d/o nos; hx of polysubstance

20

simply repeated her three IQ scores without evaluation, and noted "No records from dev period." (R. 307). Dr. Neville was obviously incorrect in stating that scores from Mr. Belton's developmental period were not present because Mr. Belton's high school transcript, containing his Otis Gamma score, was part of the record evidence at this time. (R. 59, "ARSENAL TECH HIGH SCHOOL report received 04/13/2007"). In the context of uncertain evaluation of the validity of Dr. Leiphart's IQ scores, the apparent unawareness of Mr. Belton's Otis Gamma score, and the absence of any evaluation of Listing 12.05C, the Court cannot find that substantial evidence supports the failure to address the Otis Gamma score or to explicitly evaluate the applicability of Listing 12.05C.

The ALJ found that Mr. Belton suffered from severe impairments of degenerative disc disease, schizoaffective disorder, and substance abuse, all of which satisfy the requirement of Listing 12.05C for a physical or mental impairment that imposes a significant work-related functional limitation, in addition to a valid IQ score of 60 through 70. Mr. Belton 1973 Otis Gamma score is evidence from his developmental period that tends to support the validity of Dr. Leiphart's IQ and GAF scores, and other medical opinions in the record indicating that Mr. Belton suffers from borderline or low intellectual functioning or is mentally incapable of sustaining work. But it appears, on this record, that neither the ALJ, the state-agency reviewers, nor Dr. Leiphart were aware of Mr. Belton's Otis Gamma IQ score; at least none of them mentioned, acknowledged, or articulated an

---

abuse" (R. 307 (original ellipses)).

evaluation of the score in the context of Dr. Leiphart's IQ scores. Because Mr. Belton's 1973 IQ or mental-ability score was highly relevant to the evaluation of his mental impairment and the applicability of Listing 12.05C, the ALJ was required to articulate his evaluations of the 1973 score in the context of Listing 12.05C and/or to seek a supplemental opinion of Dr. Leiphart based on the 1973 score.[15]

**b. Reception-Diagnostic Center Psychiatric Evaluation/Treatment Plan (R. 458-59) and Midtown Community Mental Health Center reports for December 5, 2006 (R. 365-67), April 14, 2007 (R. 326), April 19, 2007 (R. 324), and November 5, 2007 (R. 372-73).** Mr. Belton argues that the ALJ ignored these reports despite the inclusion of various identified pieces of information therein that "were needed to prove both Listings 12.03 [schizophrenic, paranoid, and other psychotic disorders] and 12.04 [affective disorders]" and/or that his disability onset date occurred before expiration of his insured status. Mr. Belton does not show how any of the information he identifies in these reports demonstrates that substantial evidence fails to support the ALJ's determination or is of such importance — compared to the often identical or similar evidence that the ALJ did discuss — that the ALJ erred by not specifically articulating his evaluation of it. He asserts

---

[15] On remand, the ALJ should also obtain a clear opinion by Dr. Leiphart about the validity of Mr. Belton's WAIS-III scores, as is and after consideration of the 1973 Otis Gamma score. The Court also encourages the ALJ to obtain a clarification of the basis for her GAF scores — whether they represent symptom or functional-limitation severity. The ALJ should then reevaluate this aspect of Mr. Belton's application, obtaining whatever supplemental opinions by state-agency consultants are warranted or necessary.

only that the information is relevant to "proving" the two Listings (meeting or equaling?) or his onset date, all without explanation. Without the necessary factual and legal development, his argument is forfeited. Moreover, the ALJ found that "based on [Mr. Belton's] longitudinal record of treatment for his mental impairments, I find that his medications adequately control his mental symptomatology, which is also consistent with third party reports . . . ." (R. 16). All of these medical records cited by Mr. Belton describe his symptoms when he had been off of his medications. Mr. Belton does not explain how such descriptions impugn the ALJ's finding of adequate medicinal control.

**c. Midtown Community Mental Health Center reports for March 27, 2008 (R. 396) and September 6, 2009 (R. 487).** Mr. Belton argues that the ALJ ignored these records although they reported that (1) he was referred to the Midtown Center from the jail due to increased auditory hallucinations, (2) Mr. Belton told the interviewer that he started hearing voices when he was fifteen years old and he was then put on medication; (3) he reported that he was illiterate, (4) the Midtown Center increased his Seroquel dosage at the 2008 visit, (5) he told the interviewer that it was difficult for him to talk to others, and (6) the 2009 examiner recorded a diagnosis of major depressive disorder with psychotic features. Again, because Mr. Belton does not show why each item of information in these reports either proved satisfaction of a Listing or required the ALJ's specific articulated evaluation, his argument is forfeited. *United States v. Elst*, 579 F.3d 740, 747 (7th Cir. 2009) ("Perfunctory and undeveloped arguments as well as arguments unsupported by pertinent

authority are waived."); *United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991).

**4. Failure to accord controlling weight.** Mr. Belton merely asserts that the ALJ erred by "failing to give controlling weight to the opinions of [his] treating physicians, whose findings proved the claimant was totally disabled." (*Plaintiff's Brief* at 21). Other than two case citations, this is his entire "argument." Not being even minimally developed factually or legally, this argument also is forfeited.

**5. Credibility.** Mr. Belton argues that the ALJ's credibility determination is "patently erroneous" because it is contrary to Social Security Ruling 96-7p. It violates S.S.R. 96-7p, he contends, because the ALJ "failed to make any accurate findings concerning the seven factors the Ruling requires the ALJ to consider." (*Plaintiff's Brief* at 22). He asserts only two errors. First, in regard to the second credibility factor — the location, duration, frequency, and intensity of a claimant's pain or other symptoms — the ALJ ignored the evidence showing that he was twice assessed a GAF score of 50 and once assessed a score of 30. Second, Mr. Belton argues that the ALJ's credibility determination must be reversed because his discussion was perfunctory.

The second asserted error is incorrect. Mr. Belton asserts that the ALJ's credibility discussion was limited to one "boilerplate" paragraph that appears on page eleven of the ALJ's decision (R. 22, quoted at *Plaintiff's Brief* at 22-23). If this were the entirety of the ALJ's discussion, it certainly would have been perfunctory. However, this "boilerplate"

paragraph is actually a summation paragraph that follows three and one-half pages of symptom-credibility discussion that tracks the seven factors of S.S.R. 96-7p. The ALJ's discussion was not perfunctory.

As noted above, a GAF score of 50 means that a subject either has serious symptoms or serious functional impairments including an inability to keep a job. A score of 30 represents a more severe rating. A handful of GAF scores appear in the record: Mr. Belton was assessed a current GAF of 30 as the result of a prison psychiatric evaluation in October 2003 (R. 459); Midtown Community Mental Health Center assessed a GAF of 45 in April 2005 (R. 360) and 55 in December 2006 (R. 365); as noted, Dr. Leiphart assessed a current and highest-past-year GAF of 50 in April 2007 (R. 294); and the Midtown Center also assessed a current GAF of 50 later in April 2007 (R. 324).

All of these assessments were the result of psychiatric, not physical, evaluations and, except for the December 2006 GAF of 55, they indicate the examiners' opinion either that Mr. Belton had severe symptoms (but not necessarily preventing work) or that he had severe functional limitations that rendered him unable to keep a job. Because an assessor's final score is the lower of either symptomatic or functional severity, the score alone does not indicate whether the assessor's opinion was that the subject was unable to sustain work. Although the ALJ did not mention or discuss any of the assessed GAF scores directly, Mr. Belton fails to argue or show that the ALJ failed to discuss the more detailed and substantive findings and opinions of the assessors that were included in their reports

and which the GAF scores only roughly summarized.

> GAF scores, defined in AM. PSYCHIATRIC ASS'N, DIAGNOSTIC & STATISTICAL MANUAL OF MENTAL DISORDERS 32-34 (Text Revision, 4th ed.2000), are "useful for planning treatment," and are measures of both severity of symptoms and functional level. *Id.* at 32. Because the "final GAF rating always reflects the worse of the two," *id.* at 33, the score does not reflect the clinician's opinion of functional capacity. Accordingly, "nowhere do the Social Security regulations or case law require an ALJ to determine the extent of an individual's disability based entirely on his GAF score." Rather than rely on the unexplained numerical score assigned by Boyd, the ALJ's ultimate finding of no disability was substantially supported by Boyd's narrative finding that Denton had no significant mental impairments.

*Denton v. Astrue*, 596 F.3d 419, 425 (7th Cir. 2010) (citations omitted). Mr. Belton has not shown error in the ALJ's credibility determination.

## Conclusion

Mr. Belton's application will be **REMANDED** to the Commissioner. The Commissioner is instructed to evaluate, and specifically articulate, the effect of Mr. Belton's 1973 Otis Gamma score on the issue of whether all of Mr. Belton's impairments, singly or in combination (severe and non-severe), meet or medically equal Listing 12.05C, in the context specifically of Dr. Leiphart's opinion, including her WAIS-III IQ scores, and any other relevant evidence of record, including other assessed GAF scores and psychological opinions that Mr. Belton suffers from borderline intellect or low intellectual functioning. The ALJ should obtain a clear and direct opinion by Dr. Leiphart about the validity of Mr. Belton's WAIS-III scores, as-is and after consideration of his 1973 Otis Gamma score. The Court also encourages the ALJ to obtain a clarification of the basis for Dr. Leiphart's GAF

scores — whether they represent severe symptoms or functional limitations, including an inability to keep a job. The ALJ should consider whether any supplemental opinions by state-agency consultants are warranted or necessary. All other aspects of the Commissioner's decision are affirmed.

**DONE THIS DATE:** 03/29/2012


Denise K. LaRue
United States Magistrate Judge
Southern District of Indiana

Distribution:

Thomas E. Kieper, Assistant United States Attorney
United States Attorney's Office
tom.kieper@usdoj.gov

Patrick Harold Mulvany
patrick@mulvanylaw.com